## J. K. TYLER, *et al.*, v. S. J. SAFFORD.

1. DAMAGES; *Attorney fees and Expenses.* Where S., a new-comer in the county of Butler, is sued in attachment, and instead of employing counsel resident in that county, goes to Emporia, Lyon county, the county in which he formerly lived, and distant not to exceed seventy miles, and employs counsel there with whom he is acquainted, and who had previously transacted business for him, and through their services obtains a dissolution of the attachment, *held,* in an action to recover damages for the wrongful attachment, that it was a question of fact for the jury whether under all the circumstances his conduct in employing counsel from another county was reasonable and proper; and if they find that it was, he may recover the expenses, which he was compelled to pay, of their traveling between their home and the place of trial. He is not, as a matter of law, bound to bear such extra expense himself.

2. CHATTEL MORTGAGE, *When Void as to Third Parties.* A mortgage of personal property is, unless filed in the register's office, absolutely void against subsequent purchasers in good faith; and where the controversy is between the mortgagee and a purchaser from such subsequent purchaser, if the jury find that the purchase by such subsequent purchaser was in good faith, without notice, and for value, the question of the validity of the mortgage and the sufficiency of its consideration becomes immaterial.

3. ———— A purchaser of personal property in good faith and without notice, takes a good title notwithstanding a prior mortgage, and having a good title may transfer such title to anyone, and this notwithstanding the latter may have actual knowledge of the prior mortgage.

### *Error from Lyon District Court.*

ACTION brought by *Safford* against *Tyler* and another, on an attachment undertaking. Verdict and judgment for plaintiff, April 1, 1883, for $285.73. Defendants allege error, and bring the case here. The facts appear in *Tyler v. Safford,* 24 Kas. 580, *et seq.,* and in the opinion, *infra.*

*Scott & Lynn,* for plaintiffs in error.

*J. Jay Buck, L. B. Kellogg,* and *C. N. Sterry,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action on an attachment under-taking. The facts are these: On November 28, 1879, Tyler, one of the present plaintiffs in error, commenced an action of attachment in the district court of Butler county against the present defendant in error, and caused certain property to be attached. Shotwell, the other plaintiff in error, was surety on the undertaking in the attachment. Thereafter, on motion, the attachment was dissolved by the district judge, and on error to this court his ruling was sustained. (24 Kas. 580.) For further statements of the facts in that case, see the opinion then filed. Thereafter this defendant in error commenced an action in the district court of Lyon county against the plaintiffs in error on such undertaking, to recover damages for a wrongful attachment. The case was tried before a court and jury; verdict and judgment were in favor of the plaintiff for $285.73, and the defendants allege error.

The first question we shall consider is this: Safford, the defendant in the attachment suit and plaintiff in this, resided in Augusta, Butler county. The attachment was commenced in the district court of that county. He, instead of employ-ing lawyers in that county, came up to Emporia, Lyon county, and employed Messrs. Buck and Kellogg, of that city, to look after the case. On the trial he was permitted to prove the amount charged by Messrs. Buck and Kellogg for their services in obtaining a dissolution of the attachment, his ex-penses in going to and returning from Emporia, his and their expenses paid by him in attending before the judge of the district court on the motion for the dissolution of the attach-ment, their expenses paid by him in attendance on this court when the case in error was argued before us. Now the con-tention is, that while defendant was of course at liberty to go outside of Butler county, in which the suit was commenced, and in which at the time resided many practicing attorneys, and bring counsel from another county, yet if he did so, he should pay all the extra expenses caused thereby, and has no

39 — 31 KAS.

right to charge them up against the plaintiff in the attachment suit. It should be remarked that defendant had only been a short time a resident of Butler county; that he had been prior to that time a resident of Lyon county, and was acquainted with Buck and Kellogg, they having previously done some business for him. Upon this question the court charged as follows:

"The plaintiff has a right to recover for reasonable costs and expenses necessarily incurred by him, including attorney-fee and compensation for time spent in and about obtaining the order of dissolution, and a return of the attached property. The plaintiff would not have the right to go an unreasonable distance to employ counsel and recover the extra expenses incurred thereby. He would, however, be entitled to employ counsel of good reputable ability and character, and recover fair and reasonable compensation for their necessary services, and he would have the right to receive this amount without regard to where his counsel resided. In determining whether this plaintiff acted reasonably or not, you will consider his knowledge, acquaintance, and all the circumstances of the case. The plaintiff cannot in any event recover more than a reimbursement for his reasonable expenses and loss occasioned by such attachment as shown by the evidence in the case."

No special instruction on the question was asked by the defendants. We think the rulings of the district court are correct. The plaintiff had a perfect right to show what he did in fact pay out, and why he went outside of Butler county to employ counsel, and it is for the jury to say whether his action in that respect was reasonable and fair, and if it was, his expenses incurred thereby were properly charged to the plaintiff as caused by his wrongful attachment. This is all that we think necessary to say in reference to plaintiffs' claim. The reasonableness of counsel's charges was not attacked, no serious question made as to the amount paid by the plaintiff, or the time occupied by him; and we think the finding of the jury as to the reasonableness and propriety of his conduct is abundantly justified by the testimony.

We pass now to the questions raised by the answer and the reply. In order to obtain a full understanding of these questions, we must premise the following facts, which appear in this case as well as in the attachment action heretofore referred to: That Safford and one T. J. George, under the firm-name of S. J. Safford & Co., were doing a lumber business at Augusta, Butler county, under the personal management of Safford, who had actual possession of the partnership property; that T. J. George was giving his personal attention to the carpenter and building business, carried on, upon his own account, at Emporia; that George became indebted to Tyler for building material in the sum of $1,992; and that as an additional security to the liens which he, Tyler, was entitled to claim under the statute for this material, George executed to him on November 7, 1879, a contract in the nature of a chattel mortgage on his interest in the business of S. J. Safford & Co., estimated by the parties to the contract to be of the value of $739.94. The contract specially provided that the acceptance of the interest of George in the business of S. J. Safford & Co. was not to operate as a discharge or release of Tyler's liens for his claims, and said George was to have six months from the date of the contract to pay the debt. Afterward Tyler went to Augusta, and upon the supposition that the chattel mortgage was an absolute conveyance to him of the interest of George in the firm of S. J. Safford & Co., he represented to Safford that he had bought out George's entire interest in the business, and proposed to sell it to him. He produced the chattel mortgage, calling it a bill of sale, and read a portion only of it to him. Safford then told Tyler he would purchase from him the interest of George in the firm, and pay him $715, upon the condition that upon investigation it should turn out that Tyler had in fact such entire right and interest of George in the partnership, and that George had not in any manner lessened or impaired his interest. Now in his answer, Tyler sets up the same mortgage interest, and further alleges that plaintiff, through a fraudulent conspiracy with his partner George and other parties unknown, converted

to his use Tyler's said mortgage interest.   In reply, plaintiff
alleged that George's mortgage to Tyler was without consid-
eration and void; and further, that one N. E. Weaver, with-
out notice of Tyler's mortgage, and in good faith, on November
24, 1879, bought of George his said interest, and that the
plaintiff on the next day purchased the same from said Weaver,
and has ever since been the owner thereof.   As stated by coun-
sel for plaintiffs in error —

"The principal controversy on these facts is, first, what
was the consideration for said mortgage? second, was N. E.
Weaver a *bona fide* purchaser without notice? and third, if
he was such a purchaser, did the plaintiff, Safford, and his
partner, George, conspire together to cheat and defraud Tyler
out of his mortgage interest by means of the intervention of
N. E. Weaver as a *bona fide* purchaser?"

These three questions of fact, the jury, both by their gen-
eral verdict and at least as to the first two by answers to
particular questions, found squarely against the defendants.
This by the settled practice of this court is conclusive, pro-
viding there was testimony fairly warranting such findings.
Counsel for defendants earnestly insist that they were plainly
against the evidence, and this compels a brief reference to
some of the testimony.   We shall not attempt to notice it in
detail, for it is very voluminous, covering several hundred
pages of record.   The veracity of witnesses is challenged,
and after a careful comparison of the statements of the wit-
nesses *pro* and *con*, we think it is a fair conclusion that on
the one side or the other, there was developed a rare facility for
forgetfulness.   The conclusions of the jury compel the con-
viction that this unfortunate manifestation of human weak-
ness was mainly on the side of the defendants; and whatever
doubts we may have (and we confess that they are weighty)
of the correctness of this conclusion, there is not enough to
justify us in disregarding it.   It is very evident that neither
side during these difficulties was taking any extra pains to
practically illustrate the beauties of the golden rule.   Each
was evidently striving to gain and hold whatever advantages
the law would permit.   We think this fact must have im-

pressed itself upon the jury, and that in the contradiction and conflict of the evidence they found the facts to be such as seemed probably to be correct, and such as would most likely do justice between the parties; and their conclusion, we are inclined to think, was substantially correct.

Turning now to the second question, which is the pivotal one, and this appears from the testimony: The chattel mortgage from George to Tyler was executed November 7, 1879. It was not filed in the register's office until March 11, 1880. Until such time it was by the statute, (Comp. Laws 1879, p. 557, § 9,) absolutely void as against subsequent purchasers in good faith. On November 21, 1879, Tyler went to Augusta, and there attempted to sell to Safford. On November 22, 1879, Safford and Tyler came to Emporia, and on the evening of that day the negotiations between the parties were apparently broken off and the attempted sale fell through. The value of George's interest in the partnership of Safford & Co. on January 1, 1879, was $739, and the price talked of, if not agreed upon between Safford and Tyler, on the 21st of November, was $715. On the 24th of November, Weaver purchased this interest of George, paying therefor $700 — $300 in cash, and $400 in judgments which he held against George. On the same day, a few hours thereafter, he sold the same interest to Safford at the same price, receiving $500 in cash and $200 in a note. Both of these transfers were evidenced by bills of sale, both dated November 24. The first executed on that day, but the second not executed until the 25th; Weaver, according to the testimony, declining to sign on account of a warranty contained in it until he had seen and consulted his attorney, whom he could not find until the 25th. That this purchase was made by Weaver on the 24th, seems to be abundantly established by the testimony. There is no attempt to contradict the statement that Weaver held and receipted these judgments against George for $400. He produced the check for $300 on which, as he testifies, he drew the money from the bank which he paid to George. And indeed, the testimony which the defendants offered, to

impeach the *bona fides* of Weaver in the matter tended to show that some such transfer in fact took place. So that the jury could not well have found other than it did, that Weaver made this purchase. Also, that he sold to Safford is abundantly established.

Now as to the knowldege of Weaver and his good faith in the matter, his own testimony is clear, emphatic, and positive. It is suspicious, it is true, that he bought and sold the same day at the same price, and to a party who was evidently anxious to wipe out any claim which Tyler might have acquired by his alleged purchase; but in explanation of this it may be stated that George, who was a contractor and had been engaged in building several houses, one of them belonging to N. E. Weaver, had evidently broken up in endeavoring to fill his contracts, so that the judgments against him were of comparatively little value, and Weaver by this purchase and sale was securing payment of a bad debt.

On the other hand, it must be noticed that a witness, apparently disinterested, testified to conversations at the time of this alleged purchase, and at the time of a settlement a few days before between Tyler and Weaver, which indicated knowledge on the part of Weaver of Tyler's mortgage; so that it is doubtful, to say the least, whether the testimony does not preponderate in favor of Weaver's having knowledge. But as has been often said, we do not sit as triers of fact, and we may not ignore the positive testimony of Weaver sustained by the verdict of the jury, as well as the approval of the trial judge.

It should also be noticed here, that the court instructed the jury that the knowledge of facts sufficient to put a reasonable person upon inquiry, was notice of all facts which such inquiry would have developed. The question was fairly, fully, and distinctly presented by the court in its instructions, and the verdict of the jury must be accepted as conclusive.

We have thus glanced at some of the facts bearing upon this question, for the reason that we think it is pivotal, and its determination avoids the necessity of inquiry into many

of the questions presented by counsel. If Weaver was a *bona fide* purchaser without notice and for value, he acquired a good title to the property, and could transfer such good title to any third party even though such third party had actual knowledge of Tyler's mortgage. Therefore, whether Tyler's mortgage was good or bad, whether inquiry into its consideration was proper, is immaterial. Grant that that mortgage was valid, that the jury should have been so instructed, and that no inquiry should have been made as to its consideration, and still if Weaver was a *bona fide* purchaser the verdict should have been what it was. If the only inquiries therefore remaining would be, whether the court erred in admitting testimony bearing upon the question of the *bona fides* of this transfer, or erred in its instruction respecting such transfer, or whether the testimony in respect to the consideration of the mortgage, (which for the present we shall assume was improperly admitted,) was of a character to unduly influence the jury in determining the question of the *bona fides* of this transfer, these questions must, we think, all be answered in the negative.

We have heretofore referred as fully as we deem necessary to the instructions of the court respecting the *bona fides* of the transfer. We see no ruling as to the admission and rejection of testimony concerning such transfer, which is sufficient to justify a reversal of the judgment. We do not mean to affirm that technically every ruling of the court in respect to the admission and rejection of testimony bearing upon this question is beyond criticism, but we do think that no testimony of a substantial nature proffered by either party was improperly rejected, or that any like testimony was unduly admitted. Hence the errors, if errors they were, were of a trivial nature, and ought not to disturb the judgment.

With respect to the testimony impeaching the consideration of the mortgage, we remark that so far as the testimony bore directly upon that question, it could not in any manner affect that of the *bona fides* of the subsequent transfer. The most that can be said against it is, that the apparent hesitancy

and forgetfulness of the witness Tyler as to the conversations between himself and George prior to the execution of such mortgage, may have prejudiced the jury and made them slow of credence as to his other testimony. If·this be the fact, as possibly it may be, he has only himself to blame. If his forgetfulness was real, the jury may well have doubted his memory of other matters. If it was feigned, they had a right to look with suspicion on the value of his testimony. Of course in this way, the inquiry into the consideration of the mortgage may have wrought prejudice to the defendants, but we cannot think that under the circumstances· it is sufficient to justify us in setting aside the verdict. We cannot believe that the jury were unduly influenced by it as respects the *bona fides* of the transfer.

Our conclusion on the whole record is, that the finding of the jury in respect to the transfer is unimpeachable, and that there is no error in the record of sufficient moment to justify us in disturbing the verdict.

The judgment will therefore be affirmed.

All the Justices concurring.